50 CCPA

**Application of Joseph J. DAILEY (Deceased), John Altorfer, Assignee (Substitute).**

**Patent Appeal No. 6975.**

United States Court of Customs and Patent Appeals.

June 6, 1963.

Watson D. Harbaugh, Evanston, Ill., and Robert B. Harmon, Washington, D. C., for appellant.

Clarence W. Moore, Washington, D. C. (S. Wm. Cochran, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

MARTIN, Judge.

This is an appeal from a decision of the Patent Office Board of Appeals affirming the examiner's rejection of claims 15–17 and 22–29 of appellant's application Serial No. 477,007, filed December 22, 1954, for a bearing. No claims have been allowed.

Claim 16 is representative and reads:

"16. A light weight bearing, a circumferential portion bonded to said bearing of a material relatively heavier than said bearing, and intimately bonded thereto in good heat exchange relation therewith, the interfaces of said relatively light metal portion and said relatively heavier portion being unoxidized and configured to afford interlocking action therebetween and including a metal having a melting point above the boiling point of the metal of the bearing and an intermetallic compound of the two materials of said bearing circumferential portion, the bond extending beneath the surface of said portion."

Appellant's application discloses a bearing with or without an oil groove. The bearing comprises a thick body of lightweight metal, e. g., aluminum, having intimately bonded thereto, to provide tensile strength, a comparatively thin circumferential reinforcing back of a different metal, such as stainless steel, that is relatively heavier than the lightweight metal. The intimate bond between the lightweight metal and heavier metal is formed by using an intermediate bonding layer of a metal, such as molybdenum, whose melting point is above the boiling point of the lightweight metal and above the melting point of the heavier metal. One method of obtaining the intimate bond is to spray molten molybdenum [1] against a body of aluminum, heated for example, to approximately 450°F. The molten molybdenum arrives at the surface of the aluminum at a temperature sufficiently high to vaporize a thin outer layer of the aluminum thus forming a temporary protective atmosphere of aluminum vapor. The vaporization of the aluminum removes oxides and surface impurities from the surface of the aluminum and thus permits the deposit of sprayed molybdenum on an unoxidized surface of the aluminum.[2] Some of the vaporized aluminum thereafter condenses and solidifies on the outer surface of the intermediate layer of molybdenum. Spraying the stainless steel in molten condition on the exposed intermediate layer of molybdenum having the condensed aluminum on its exposed surface then combines the stainless steel with the condensed aluminum to the extent that the condensed aluminum is present and forms a layer of ferrous aluminate. Appellant in the application states that from three metals [3] employed in making his bearing, four layers of metal [4] are obtained which are "bonded so intimate-

---

1. The record indicates that molybdenum melts at 2620°C. and is molten up to 4803°C.

2. Appellant points out in his brief that it is well known that the moment aluminum is exposed to air its surface oxidizes. The oxidized aluminum surface, appellant states, "thwarts any bonding other than mechanical."

3. Aluminum, molybdenum and stainless steel.

4. Aluminum, molybdenum, ferrous aluminate and stainless steel.

ly that crush tests disclose that fractures occur without respect to inter-faces."

The references relied on by the examiner and the board are:

| Hensel et al. | 2,531,910 | Nov. 28, 1950 |
| Shepard (I) | 2,588,421 | Mar. 11, 1952 |
| Shepard (II) | 2,588,422 | Mar. 11, 1952 [5] |
| Coppen | 2,631,905 | Mar. 17, 1953 |

The Shepard patents each disclose bonding together of various metals by means of an intermediate layer of molybdenum. Examples of metals that are bonded together are aluminum and steel.

Hensel et al. describes a cylindrical aluminum alloy bearing bonded to a reinforcing backing of steel by means of an intermediate bonding layer of silver.

The Coppen patent discloses a bearing in which the bearing surface is provided with oil receiving grooves.

Claims 15–17, 23–27 and 29 stand rejected as unpatentable over Hensel et al. in view of the Shepard patents while claims 22 and 28 were rejected as being unpatentable over Hensel et al. in view of the Shepard patents and Coppen. It is the examiner's position that it would not "require invention to make a bearing of the type disclosed by Hensel et al by first coating the bearing alloy strip with a layer of sprayed molybdenum and then applying a layer of sprayed steel thereto in view of the teaching of Shepard (II) or Shepard (I)" and "to provide * * * a groove [as shown in the Coppen patent] in the bearing of Hensel et al., as modified by the teaching of the Shepard patents, would not require invention." The examiner considered that Shepard in the Shepard (II) patent will achieve an unoxidized surface between the aluminum layer and the molybdenum layer to the same degree that appellant will achieve such a layer.

Our task is to decide whether, at the time of appellant's invention, his laminated bearing would have been obvious to one with ordinary skill in the art having knowledge of the cited references.

We are of the opinion that, in the light of the record before us, this question must be answered in the affirmative.

The Shepard patents disclose that a strong bond can be obtained between a base metal such as aluminum and a spray metal such as a steel by the use of an intermediate spray coating of molten molybdenum. The specification of the Shepard (I) patent reads in part:

"The invention is essentially an improvement in the method for aplying [sic] spray metal to an inorganic surface, particularly a surface of metal or of non-metal vitreous material, with a high degree of bond, which comprises conditioning such surface for spray metal bonding by spraying at least a flash coating of molybdenum thereon and thereafter spraying metal onto the thusly coated surface.

\* \* \* \* \*

"Particularly strong bonding characteristics are exhibited by the use of the molybdenum coating in conjunction with the alloys of steel, including stainless alloys of steel and also with the alloys of aluminum and of magnesium.

\* \* \* \* \*

"By way of exemplification, suitable base metals for instance include \* \* \* *aluminum* and aluminum alloys, \* \* \*. The following spray metals may be applied to these bases: \* \* \* steel alloys including various *carbon steels* and also including stainless steel alloys, \* \* \*." [Emphasis ours.]

5. Both 2,588,421 and 2,588,422 are to Arthur P. Shepard.

The Shepard (II) specification states in part:

"The method in accordance with the invention essentially embraces an improvement in the application of spray metal to the bore surface of an *aluminum* engine cylinder *with a high degree of bond,* which comprises conditioning such surface for spray metal bonding by spraying at least a flash coating of molybdenum thereon and thereafter spraying a metal, and preferably a metal substantially harder than the aluminum of said bore, onto the thusly coated surface.

\*   \*   \*   \*   \*

"Any metal which is capable of being sprayed may then be sprayed directly on to the molybdenum sprayed surface. \* \* \* For example, a common metal to use for an ordinary internal combustion engine would be a high carbon *steel,* \* \* \*." [Emphasis ours.]

The Shepard patents also suggest that the presence of an oxide is deleterious to the formation of a strong bond. Both of the Shepard patents state:

"The surface to be sprayed upon with molybdenum should, however, be a clean surface. Cleaning may be accomplished satisfactorily in numerous ways, such as by abrasion, light sand blasting, acid etching, and the like procedures. *These are particularly to be used with metals when there is any danger of oxides being present on the surface.* If the surface is relatively clean of oxides and is merely to be freed from dirt particles or greasy matter, it may suffice if the same is cleaned with a suitable solvent or the like. [Emphasis ours.]

\*   \*   \*   \*   \*

"During spraying operations it is advisable, as for instance set forth in the examples, to avoid conditions of oxidation during spraying. The reason is that excessive oxidation of the subdivided molybdenum particles will impair the adhesion characteristics of the ultimately applied spray metal coating to the base.

Appellant contends that in the bonding of the metals in his bearing "There is no layer of aluminum oxide between the aluminum and molybdenum" and that in the bonding of the metals in the Shepard patents Shepard does not mention nor provide for this feature. It is argued that the spray distances [6] disclosed in the Shepard patents for the application of the molybdenum are too great for the vaporization of the oxidized aluminum surface with the resultant formation of a momentary protective atmosphere of aluminum vapor. Appellant admits that if Shepard does obtain an unoxidized interface bond, Shepard's bond strength would have to be the same as that of appellant's bond strength. Appellant urges that his spray gun must move "close enough" to the work to vaporize the aluminum oxide. However, in his specification he does not give any exact spray distance for applying molybdenum.

To support his contention appellant submitted an affidavit by Donald B. Roach of the Battelle Memorial Institute. The pertinent portion of the affidavit reads:

"In the early part of 1956, Battelle Memorial Institute was called upon to determine the relative merits of the Darcey process [7] disclosed in the above-entitled application and the process disclosed in the Shepard U. S. patents Nos. 2,588,421 and 2,588,422 in spraying molybdenum

---

6. The spray distances referred to are the distances the molybdenum spray travels from the spray gun nozzle to the aluminum surface.

7. The record states that appellant's process is referred to occasionally by Battelle as the "Darcey Process" and that a recorded assignment identifies appellant's application with the Darcey Engineering Corporation.

and stainless steel upon aluminum. This work was conducted in anticipation of the preparation of an affidavit for filing in the above-entitled application;

"In performing this work, flat pieces of aluminum prescribed by Battelle were degreased and wire brushed, sprayed under varying conditions in accordance with the respective teachings of said application and said patents under the direction of a representative of Battelle Institute for bend-test and shear test upon Battelle testing machines;

"The results of the bend tests were fairly consistent in that all specimens sprayed according to the Darcey process disclosed in said application required a greater load to induce fracture than was required to fracture the specimens sprayed according to the Shepard process disclosed in said patents;

"The results of the shear tests indicated trends that all of the specimens sprayed in accordance with the Darcey process exhibited higher shear strengths than specimens sprayed according to the Shepard Process. Average shear strength upon the Darcey process was about 1340 p. s. i. while that of the Shepard process showed an average of 710 p. s. i.;

"The results indicate that either decreasing the distance from which the molybdenum was sprayed onto the aluminum, or increasing the temperature of the aluminum prior to spraying tended to increase the load required to fracture the bond;

"From the results of both bend and shear tests, the Darcey process appeared to produce higher bond strength than the Shepard process. The improved bond strength in the Darcey process is attributed to its employment of a shorter distance between gun and work and a higher temperature for the work piece."

As to the affidavit, the board said:

"Unfortunately for appellant's case, this affidavit is of little probative value, not because of any lack of qualifications of those conducting the tests, but because of the absence from the affidavit of any substantial factual data concerning the procedure followed for the tests. The affidavit does not set forth the exact physical conditions under which Shepard's and appellant's test bonds were produced. In the absence of this data the affidavit is merely an expression of an opinion by the affiant of a conclusion which we can accept only by our consideration of the facts upon which such a conclusion could be based.

"This requirement for factual data is far from a mere formal matter. Each of the Shepard patents disclose numerous processes each differing from the other with some more similar to appellant's process than others. The affidavit does not identify which process was assumed to be the 'Shepard process' for testing purposes."

We agree with that statement of the board. We find the affidavit inconclusive as proof of any improvement in appellant's spray coating specimens over the spray coating specimens produced by the process of the Shepard patents. Affiant identifies the processes used in producing the test specimens merely as "the Darcey process disclosed in the above-entitled application and the process disclosed in the Shepard U. S. patents Nos. 2,588,421 and 2,588,422" and states that "improved bond strength in the Darcey process is attributed to its employment of a shorter distance between gun and work." The affidavit, however, by failing to refer to any distance at all serves no purpose as to proof of the inoperability of Shepard's process to produce the improved bond strength. This is so since in the Shepard (I) patent in the two specific examples involving the application of molybdenum coatings to metal the coating gun nozzle is

 

held at distances of approximately 5 inches and 6 inches from the surface to be coated, while Shepard in the Shepard (II) patent in describing an example of his process, calls for a spray distance of "approximately 4 inches in length" for the application of the molybdenum to the metal. In spraying molybdenum "according to the Shepard process disclosed in said patents," the affiant could, obviously, have employed a spray distance of approximately 4, 5 or 6 inches. The distances mentioned in the two Shepard patents might well be effective, especially since, as we have noted, no specific distances are stated by appellant in his specification.

The affiant also attributes a "higher temperature for the work piece" as a reason for the improved bond strength. The Shepard patents, however, indicate the need for a sufficiently high temperature in the melting zone. Both of the Shepard patents state:

> "Excessive oxidation conditions may be avoided by using a relatively slow wire speed for the molybdenum as it feeds through the gun and by using oxygen as little as possible and *still obtain a sufficiently high temperature in the melting zone."* [Emphasis ours.]

Moreover, the affiant makes no mention of the specific temperatures employed in producing the test specimens.

Appellant contends that the sufficiency or probative value of the affidavit "is believed to be moot or 'adjudicated' since the Patent Office has already twice accepted it and considered it favorably." It does appear that the same affidavit was submitted in two applications which have now matured into patents. However, it is obvious that that has no bearing on the present case. The considerations which led to the allowance of those patents are not matters of record in this proceeding. The only issue here is whether the affidavit supports appellant's contention that his invention is patentable over the cited references. We do not think that the affidavit has this effect.

In summary, the Hensel et al. patent and the Coppen patent disclose, respectively, a steel reinforced aluminum alloy bearing and the use of oil grooves in a bearing. We think it would be obvious to a person of ordinary skill in the art to employ the Shepard process with the teachings of the Hensel et al. and Coppen patents to produce appellant's invention.

For the foregoing reasons the decision of the board is affirmed.

Affirmed.